UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **WILLOW BEND VENTURES, LLC** | **17-11178** |
| | SECTION A |
| DEBTOR | CHAPTER 11 |
| **WILLOW BEND VENTURES, LLC, and BANKPLUS** | ADVERSARY NO. |
| | **18-1133** |
| PLAINTIFFS | |
| VERSUS | |
| **RIVER PARISHES DIRT & GRAVEL, LLC** | |
| DEFENDANT | |

## <u>MEMORANDUM OPINION</u>

Trial in the above-captioned adversary proceeding came before the Court on February 14, 2019. At the conclusion of trial, the Court granted the parties time to file simultaneous briefs. Briefs were filed on March 25, 2019, after which the Court took the matter under advisement.

**I. Facts:**

On May 9, 2017, Willow Bend filed a Voluntary Petition for Relief under Chapter 11 of the Bankruptcy Code. No trustee was appointed, and Willow Bend is a debtor-in-possession pursuant to 11 U.S.C. § 1107.

Hensley R. Lee Contracting, Inc. ("HRLC") is the sole member Willow Bend and Hensley R. Lee ("Lee") is the President of HRLC and Manager of Willow Bend.

When Willow Bend filed for bankruptcy relief, it owned and operated a clay pit in St. John the Baptist Parish, Louisiana ("Property").

After Willow Bend filed for relief, Lee, individually, and HRLC entered into an "Agreement to Purchase or Sell Willow Bend Ventures, LLC's LLC Member Interest" to River Parishes Dirt & Gravel, LLC ("Purchase Agreement") for $7,500,000.[1] The Purchase Agreement identifies Lee and HRLC as "Sellers," and Lee and HRLC signed as "Sellers."  River Parishes is identified as and signed as "Buyer." Willow Bend is defined in the Purchase Agreement as "LLC."  Lee, as agent for HRLC, signed the Purchase Agreement for Willow Bend as "Company."

The Purchase Agreement provides under "Recitals":

Sellers desire to sell and Buyer desires to purchase all the Membership Interest of the LLC on the terms and conditions set forth herein.[2]

The Purchase Agreement further provides:

1. Purchase and Sale. On the date hereof, Seller and LLC agree to sell, assign and convey the Membership Interest to Buyer, and Buyer agrees to acquire the Membership Interest from Sellers, and obtain the following assets in the LLC, all on the terms and subject to the conditions set forth herein.

a) Property. Subject to the terms, provisions and conditions of this [Purchase Agreement], Sellers and LLC hereby covenant and agree to sell to Buyer, and Buyer hereby covenants and agrees to buy from Sellers and LLC, ... [the Property].

b) Equipment and Movables. ...[3]

---

[1] Exh. 1.  John Ohle  testified that River Parishes wanted to purchase the membership interest of HRLC, rather than Willow Bend's assets, because River Parishes believed Willow Bend's permits were nontransferable.  P-51, Tr.T. 2/14/19, p. 164.  Ohle works for Kensington Realty Group.  River Parishes hired Kensington Realty Group to facilitate the Purchase Agreement. Ohle also helped facilitate the New Purchase Agreement and is now the Chief Operating Officer of Edgard Construction Materials Holding, LLC.

[2] *Id.*

[3] *Id.* at p. 1-2.

The purchase price of $7,500,000 is "payable from Buyer to Sellers."[4] Willow Bend did not receive consideration under the Purchase Agreement.

Willow Bend made no representations or warranties in the Purchase Agreement. The representations and warranties made by Lee and HRLC as "Sellers" were:

> 10.  <u>Representations and Warranties of Sellers</u>.  Sellers, both jointly and separately, represent and warrant as follows:
>
> *                                 *                                 *
>
> (c) The LLC is duly organized, validly existing and in good standing under the laws of the State of Louisiana and has all requisite power and authority to execute, deliver and perform the transactions contemplated by this Agreement;
>
> (d) Sellers own the Membership Interest free and clear of any security interest, lien or claim of any party ...
>
> (e) The LLC owns the Property free and clear of any security interest, lien or claim of any party. ...
>
> *                                 *                                 *
>
> (h) Except as specifically set forth in Schedule 10(h),[5] there is no action, suit, or proceeding pending or, to the best of Sellers' actual knowledge, threatened against or affecting Sellers or the LLC in any court, or by or before any federal, state, municipal or other governmental department, commission, board, bureau, agency or instrumentality, which would have an adverse effect on the transactions contemplated hereby;
>
> *                                 *                                 *
>
> (k) To Sellers' actual knowledge, as of the date hereof, the LLC has no liabilities, contingent or otherwise other than those set forth in the balance sheet annexed hereto as <u>Exhibit G</u>[;]

---

[4] *Id.* at p. 3.

[5] There is no Schedule 10(h).

(l) Sellers delivered good and merchantable title to the Property that is not subject to defects or adverse encumbrances, including but not limited to surface rights, mineral rights or other rights held by the LLC other than the Permitted Encumbrances; ...[6]

Attached as Exhibit G to the Purchase Agreement is Willow Bend's Balance Sheet dated April 30, 2017. The Balance Sheet lists $232,561.78 in "Sales Tax Payable" and a "Property Loan" of $1,756,323.31 due BankPlus. As of April 30, 2017, Willow Bend owed a Tax Judgment entered on April 11, 2017, in favor of St. John the Baptist Parish Sales and Use Tax Collector ("St John") in the amount of $1,479,914.17. Willow Bend was also the guarantor on a debt owed to BankPlus by HRLC. Neither amount was included on Willow Bend's Balance Sheet.[7]

On the date the Purchase Agreement was executed, River Parishes was not aware that Willow Bend had filed for bankruptcy relief; BankPlus had a security interest in the Property which included Willow Bend's contingent obligations; and the Tax Judgment had been entered against Willow Bend.

---

[6] Exh. 1, p. 6-7. "Permitted Encumbrances" is not a defined term.

[7] The Court notes that pursuant to Generally Accepted Accounting Principles (GAAP) contingent debt is not reflected on a Balance Sheet unless there is an articulable risk of default by the principal. Ross, Sean. "Reporting Requirements of Contingent Liabilities and GAAP Compliance." Investopedia, Investopedia, 12 Mar. 2019, www.investopedia.com/ask/answers/042415/how-are-contingent-liabilities-reflected-balance-sheet.asp. River Parishes provided no evidence of HRLC's default. Although Willow Bend had not yet appealed the Tax Judgment, it intended to, and eventually did, file a timely appeal. *See Willow Bend v. St. John*, adv. 17-1050, P-18 (Appeal was timely through May 9, 2019.).

On June 29, 2017 River Parishes learned that Willow Bend had filed for bankruptcy relief.[8] River Parishes abandoned the Purchase Agreement believing that Willow Bend's bankruptcy prohibited its completion.[9]

On October 5, 2017, Willow Bend negotiated a purchase agreement to sell its assets, including the Property, to River Parishes for $7,200,000,[10] and on October 13, 2017, Willow Bend filed a Motion for Authority To Sell Assets to River Parishes or its assignee ("New Purchase Agreement").[11]   The Court granted the Motion for Authority to Sell on January 4, 2018.[12]

On July 16, 2018, River Parishes filed a Motion to Authorize Assignment of the New Purchase Agreement to Edgard Construction Materials Holding, LLC ("Edgard"), which was granted by the Court.[13]   The sale of Willow Bend's assets to Edgard took place on July 30, 2018.

---

[8] P-51, Tr.T. 2/14/19, p. 170.

[9] P-51, Tr.T. 2/14/19, p. 174 -175.

[10] Exh. 14.

[11] Case 17-11178, P-84.

[12] Case 17-11178, P-152.

[13] Case 17-11178, P-310, 314.  River Parishes has an interest in Edgard through Kensington Capital Advisors, the 100% member of Edgard. P-54, p. 10, ¶ 33.

Willow Bend filed a Motion to Deposit the Sale Proceeds into the Registry of the Court.[14] The sale was free and clear of liens and encumbrances.[15]  The Court granted the Motion on August 2, 2018, and $7,200,000 was deposited into and is currently held in the Registry of the Court.[16]

On May 21, 2018, River Parishes filed suit against Willow Bend, Lee, HRLC, and Wayne Allen Fletcher for fraud and intentional misrepresentation, negligent misrepresentation, civil conspiracy, breach of contract, detrimental reliance, and bad faith (the"Breach of Contract Case").[17] Because the Bankruptcy Court lacked jurisdiction over Lee, Fletcher, and HRLC, a Motion for Withdrawal of Reference was filed with, and ultimately granted by, the District Court.[18]

Willow Bend filed a Motion to Reject the Purchase Agreement dated May 22, 2017, which was denied by the Court on October 24, 2018 after a finding that Willow Bend was not a party to the Purchase Agreement and the Court lacked jurisdiction over River Parishes and HRLC.[19]

---

[14] Case 17-11178, P- 335.

[15] The liens of St. John and BankPlus were transferred to the sale proceeds in the same nature, extent, and priority.  Case 17-11178, P-321, 323.  The liens of Max J. Derbes, Inc.; Raoul A. Galan; Galan Real Estate Co.; and Acadian Coast Group, LLC were cancelled. Case 17-11178, P-320, 322, 329, 330.

[16] Case 17-11178, P-343, 348.

[17] *River Parishes Dirt & Gravel, LLC v. Willow Bend Ventures, LLC; Hensley R. Lee; and Hensley R. Lee Contracting, Inc.; and Wayne Allen Fletcher*, adversary no. 18-1093.

[18] Case 18-6910, United States District Court, Eastern District of Louisiana, P-34.

[19] Case 17-11178, P-210 and 411.

River Parishes filed an Objection to the Proof of Claim filed by BankPlus (the "Objection Case").[20]  Because this Court had a conflict of interest, that suit was transferred to Section B of this Court.

When River Parishes asserted an administrative claim for damages allegedly incurred as a result of the Purchase Agreement, Willow Bend and BankPlus instituted the instant adversary proceeding for Declaratory Relief (the "Administrative Case").[21]  The Complaint alleges that River Parishes is not entitled to an administrative expense claim and also seeks a finding that River Parishes was first to breach the Purchase Agreement.

Because the allegation of River Parishes' breach will necessarily be addressed in the pending Breach of Contract Case, this Court limited its consideration to the right of River Bend to administrative status.  The remaining issues raised by the Administrative Case Complaint are stayed pending resolution of the Breach of Contract Case.

## II.  Law and Analysis

River Parishes requests administrative status pursuant to 11 U.S.C. § 503(b).  It asserts that Willow Bend fraudulently omitted disclosure of its pending bankruptcy at the time of the Purchase Agreement.  It also asserts that Willow Bend misrepresented that the Property was free and clear of liens as well as the nature and extent of its debts.  As a result, River Parish contends that it suffered damages of approximately $2,400,000 in lost profits from the sale of clay occurring between the execution of the Purchase Agreement and the eventual sale.  In addition, River Parishes alleges

---

[20] *River Parishes Dirt & Gravel, LLC v. BankPlus*, adversary no. 18-1122.

[21] The instant adversary proceeding was instituted by Willow Bend on October 26, 2018, and BankPlus joined as plaintiff on November 14, 2018.  P-9.

7

damages for negligent misrepresentation, civil conspiracy, breach of contract, detrimental reliance, bad faith, attorneys' fees, and costs.

Whether and in what amount damages are due River Parishes is the subject of another proceeding.[22] The only issue before the Court is, assuming damages exist, is River Parishes entitled to payment as a priority administrative expense? As the party asserting the claim, River Parishes bears the burden of proof.[23]

Administrative expense claims are the second highest priority claims paid in a bankruptcy case.[24] Section 503(b)(1)(A) provides that "actual, necessary costs and expenses of preserving the estate" are administrative expenses. Administrative expenses typically "stem from voluntary transactions with third parties who lend goods or services necessary to the successful reorganization of the debtor's estate."[25]

> **An "actual and necessary cost" must have been of benefit to the estate and its creditors.** *See, e.g., In re TransAmerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir.1992). This requirement is in keeping with the conceptual justification for administrative expense priority: that creditors must pay for those expenses necessary to produce the distribution to which they are entitled. *See* 3 DANIEL R. COWAN, BANKRUPTCY LAW AND PRACTICE § 12.23(e)(1), at 83 (6th ed.1994). "That is, the costs of salvage are to be paid." *Id.* The "benefit" requirement has no independent basis in the Code, however, but is merely a way of testing whether a

---

[22] Adv. 18-1093. Willow Bend's Motion for Withdrawal of Reference was granted by the District Court. Case 18-6910, United States District Court, Eastern District of Louisiana.

[23] *Toma Steel Supply, Inc. v. TransAmerican Natural Gas Corp. (Matter of TransAmerican Natural Gas Corp.)*, 978 F.2d 1409, 1416 (5th Cir. 1992).

[24] 11 U.S.C. § 507(a)(2). Domestic support obligations and trustee fees are higher priority. 11 U.S.C. § 507(a)(1).

[25] *Total Minatome Corp.. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001) (citing *Matter of TransAmerican Natural Gas Corp.*, 978 F.2d at 1415)).

particular expense was truly "necessary" to the estate: If it was of no "benefit," it cannot have been "necessary." *See* LAWRENCE P. KING, ED., 4 COLLIER ON BANKRUPTCY ¶ 503.06 [3] [b] (15th rev. ed.1998).[26]

In asserting an administrative expense claim, River Parishes relies on an exception to the above articulated rule. The exception stems from the United States Supreme Court decision of *Reading Company v. Brown*.[27]

In *Reading*, a receiver operated an industrial business owned by the debtor. The debtor's building was destroyed in a fire as a result of the receiver's operations. The fire also damaged an adjacent property owned by Reading Company. Reading Company claimed the damages were an administrative expense. Clearly the obligations did not benefit the estate, but the Supreme Court reasoned:

> [T]orts of the receivership create claims against the receivership itself; in those case the statutory limitation to 'actual and necessary costs' is not involved, but the explicit recognition extended to tort claims in those cases weighs heavily in favor of considering them within the general category of costs and expenses.[28]

The Court held that "damages resulting from the negligence of a receiver acting within the scope of his authority as receiver give rise to 'actual and necessary costs.'"[29] The trustee's operation of an industrial manufacturing facility caused damage to a neighboring building. Since the operation of the facility was intended to benefit creditors, the Court concluded that damages incurred as a result

---

[26] *State of Texas v. Lowe (Matter of H.L.S. Energy Co., Inc.)*, 151 F.3d 434, 437 (5th Cir. 1998) (emphasis added).

[27] *Reading Company v. Brown*, 391 U.S. 471, 88 S.Ct. 1759, 20 L.Ed. 2d (1968).

[28] *Reading Company v. Brown*, 391 U.S. 483-84.

[29] *Id.* at 485.

of the risks associated with the facility's operation were appropriately considered administrative expenses.

Following *Reading*, the First and Fifth Circuits addressed the scope of a claim for damages incurred in part because of a trustee's actions.  In *In re Charlesbank Laundry, Inc.,*[30] the First Circuit applied *Reading* and allowed an administrative expense when the debtor violated a zoning ordinance and state court injunction.

> As a whole, the *Reading/Charlesbank* line of cases, recognizing an exception to the usual requirement of a demonstrable benefit to the estate, is sound.  Section 503(b)(1)(A) allows an administrative expense for the necessary costs of preserving the estate.  Damages or compensatory penalties arising from the postpetition operation of the business of the estate may well be seen as "necessary" for the estate's preservation. This is because a decision to continue business operations postpetition is made to preserve the going concern value of the estate for the benefit of prepetition creditors, and the possibility of the estate incurring damages and compensatory penalties as a result of its operations is a foreseeable risk of that decision.[31]

The Fifth Circuit applied a narrow construction of *Reading* in *In re Jack/Wade Drilling, Inc.*[32]  In *Jack/Wade*, Total Minatome Corp. ("TMC") and Jack/Wade Drilling, Inc. ("Jack/Wade') entered into a prepetition drilling contract.  The contract provided in the event of breach, the "prevailing party" was entitled to attorneys' fees, costs, and expenses.

---

[30]  *Spunt v. Charlesbank Laundry, Inc. (In re Charlesbank Laundry, Inc.),* 755 F.2d 200 (1st Cir. 1985).

[31]  4 COLLIER ON BANKRUPTCY ¶ 503.06 [3] [c][i] (Richard Levin & Henry J. Sommer eds., 16th ed.).

[32]  *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.),* 258 F.3d 385 (2001).  Another decision by the Fifth Circuit relied on *Reading, Al Copeland Enterprises, Inc. v. State of Texas (Matter of Al Copeland Enterprises, Inc.),* 991 F.2d 233 (5th Cir. 1993). The facts of *Copeland* are not relevant to an analysis of this case.

Disputes arose between the parties and Jack/Wade filed a Voluntary Petition for Relief under Chapter 7 of the Bankruptcy Code.  The Chapter 7 Trustee ("Trustee") filed suit against TMC in the United States District Court alleging breach of contract.  TMC filed a counterclaim alleging that Jack/Wade was first to breach.  The jury found that neither party had breached and, thus, did not award  fees, costs, or expenses.  TMC appealed. The Fifth Circuit vacated and remanded for a determination of the "prevailing party."  On remand, the District Court held that TMC was the "prevailing party" and awarded fees, costs, and expenses.

TMC filed a motion in Bankruptcy Court to have its fees, costs, and expenses recognized as administrative expenses.  The Bankruptcy Court denied the motion.  TMC appealed, the District Court affirmed, and TMC appealed to the Fifth Circuit.

TMC admitted that the trustee's suit had not benefitted the estate but relied on *Reading* in urging its administrative expense claim.  Under TMC's rationale, the fees and costs expended in defending the trustee's suit were only incurred because the trustee pursued the debtor's claim against TMC.  Since the suit was designed to benefit the estate by increasing its worth, the risk of loss was an administrative cost.  The Fifth Circuit found that *Reading* did not extend to "debts incurred by a non-wrongful post-petition action to liquidate a chapter 7 bankruptcy estate."[33]  Instead, the Court analyzed "whether TMC deserve[d] to get paid at the expense of Jack/Wade's existing unsecured creditors."[34]  The Court noted:

> The principle announced in Reading of "fairness to all persons having claims against an insolvent" has survived Congressional amendments to the bankruptcy code. *See* [*Reading*, 391 U.S. at 477]; *In the Matter of Al Copeland Enterprises*, [991 F.2d at

---

[33] 258 F.3d at 388.

[34] *Id.* at 389.

11

239]. ... Consistent with this objective, the statute has identified certain creditors to be preferred over others, and imposed a rule of equal distribution of the estate between the remaining unsecured parties. *See Nathanson v. NLRB*, 344 U.S. 25, 29, 73 S.Ct. 80, 97 L.Ed. 23 (1952). ... The *Reading* exception arose out of a particular set of facts in which the Supreme Court determined that this statutory objective of fundamental fairness would be defeated if the statute were applied literally.

*          *          *

The *Reading* Court identified two factors that distinguished the claim of the fire victim from that of a typical unsecured party who is injured post-petition: 1) the wrongful nature of the receiver's act, and 2) that the act was committed in the course of operating the debtor's business so as to improve the position of existing creditors. *See id.* at 477-79. ... The Court determined that the claimant was not merely an unlucky victim of the debtor's bankruptcy, but a foreseeable casualty of the receiver's negligence... [35]

The Fifth Circuit found that the trustee "neither acted wrongfully nor in the course of operating the business of the debtor so as to attempt to improve the position of the general creditors,"[36] "strictly constru[ing] the *Reading* exception."[37]

### A. Application of *Reading*

The two *Reading* factors require the Court to determine whether 1) Willow Bend acted wrongfully, and 2) whether "the act was committed in the course of operating the debtor's business so as to improve the position of existing creditors."

---

[35] *Id*. at 389-90.

[36] *Id.* at 390.

[37] *Id.* at 391.

### 1. Willow Bend Made No Representations or Warranties

The Purchase Agreement clearly defines Lee and HRLC as "Sellers," and they signed in that capacity.  The "Recitals" state the purpose of the Purchase Agreement was the sale of Lee and HRLC's "membership interest" in Willow Bend:

> Sellers desire to sell and Buyer desires to purchase all the Membership Interest of the LLC on the terms and subject to the conditions set forth herein.[38]

Members have no interest in the property of the limited liability company.[39]  At trial, John Ohle[40] confirmed that the agreement was to purchase the membership interest, rather than the assets of Willow Bend.[41]  As a result, the entire Purchase Agreement was designed to obtain control over Willow Bend through the sale of its ownership interests.

Under a plain reading of the Purchase Agreement, every representation or warranty is made by Lee and HRLC as "Sellers" or River Parishes as the "Buyer."  Willow Bend is not defined as a "Seller" but is separately defined as "LLC" and signed the Purchase Agreement as "Company."  In

---

[38] Exh. 1, p. 1.  The Court notes that HRLC owned 100% of the membership interest of Willow Bend, and Lee is HRLC's representative.  Louisiana law defines "membership interest" as "a member's rights in a limited liability company, collectively, including the member's share of the profits and losses of the limited liability company, the right to receive distributions of the limited liability company's assets, and any right to vote or participate in management." La. R.S. 12:1301(A)(14).

[39] La. R.S. 12:1329.

[40] Ohle works for Kensington Realty Group.  River Parishes hired Kensington Realty Group to facilitate the Purchase Agreement. Ohle also helped facilitate the New Purchase Agreement and is now Edgard's Chief Operating Officer.

[41] P-51, Tr.T. 2/14/19, p. 164.

paragraph 1, Willow Bend commits that the Property it owns will remain so until the sale of membership interests is complete.

The purpose of Willow Bend's limited appearance was to protect River Parishes from the possibility that the Property could be sold during the period between the execution of the Purchase Agreement and completed sale of the membership interests. The Court finds that except for Willow Bend's commitment to maintain ownership of the Property through the sale date, it made no other representations or warranties in the Purchase Agreement.[42]

Nevertheless, River Parishes contends that Willow Bend committed fraud by 1) misrepresenting that its Property could be conveyed free and clear of liens and encumbrances, and 2) remaining silent as to the misrepresentations of Lee and HRLC. Specifically, River Parishes alleges that Lee and HRLC misrepresented that Willow Bend 1) owned the Property free and clear of liens, 2) was not involved in any legal proceedings, and 3) had no debt other than those listed on the Balance Sheet attached to the Purchase Agreement. River Parishes alleges that Willow Bend knew these to be false statements and failed to correct or disclose their falsity to River Parishes.

Louisiana law defines "fraud" as:

[A] misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.[43]

---

[42] Even in cases where a party assumes the obligations of another:

A person who, by agreement with the obligor, assumes the obligation of the latter is bound only to the extent of his assumption. ...

La. C.C. Art. 1822. Willow Bend did not assume any obligations. It merely made a limited acknowledgment.

[43] La. C.C. Art. 1953.

14

"Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence."[44] "The party against whom rescission is granted because of fraud is liable for damages and attorney fees."[45]

> Two elements essential to establishing legal fraud are intent to defraud or gain an unfair advantage and a resulting loss or damage. *Heyl v. Heyl*, 445 So.2d 88 (La.App. 2d Cir.1984), *writ denied* 446 So.2d 1228 (La.1984); LSA–C.C. art. 1953.
>
> To find fraud from silence or suppression of the truth, there must exist a duty to speak or to disclose information. *Greene v. Gulf Coast Bank*, 593 So.2d 630, 632 (La.1992); *Bunge Corporation v. GATX Corporation*, 557 So.2d 1376, 1383 (La.1990).
>
> > The existence of this duty is a legal question. Relevant factors include whether the obligation is being imposed on a seller, who is more likely to be required to disclose, the importance of the fact not disclosed; the relationship of the parties; and the nature of the fact not disclosed.
>
> *Bunge, supra* at 1384. Certain special circumstances, such as where the parties stand in some confidential or fiduciary relation to one another, will give rise to a duty. *See Greene, and Bunge Corporation*, both *supra*.[46]

Thus the question becomes, did Willow Bend have a duty to disclose its knowledge regarding the representations of Sellers?

### 2.  Willow Bend Had No Duty to Disclose

Willow Bend's role in the contract is comparable to an intervenor, who is not a party to the contract and does not acquire rights or obligations against those who are parties to the contract except as to the point of intervention.

---

[44] La. C.C. Art. 1957.

[45] La. C.C. Art. 1958.

[46] *First Downtown Development v. Cimochowski*, 613 So.2d 671, 677 (La.App. 2 Cir. 1993).

15

This Court could find little jurisprudence on an intervenor's obligations under a contract. In fact, only three (3) cases touched on the subject. In *Brednich v. Bourbon Nite-Life, LLC*,[47] Bourbon Nite-Life, LLC ("BNL") entered into a management agreement with Bourbon Enterprises, Inc. ("BET") whereby Enterprises would manage and operate BNL's club. Philippe Uson ("Uson"), owner of BET, intervened as guarantor. When a third party sued BNL and BET for damages sustained at BNL's club, BNL and BET filed a cross claims against each other for indemnity. BNL filed a third-party demand against Uson. Uson asserted a reconventional demand against BNL alleging personal damages stemming from BNL's breach of the agreement with BET.

BNL filed an exception of no right of action against Uson, which was granted by the trial court. Uson appealed.

The appellate court held that intervention as a guarantor did not make Uson a party to the agreement. The agreement was between BNL and BET, and Uson received no compensation personally.

> While various provisions of the Agreement established obligations for personal performance undertaken and agreed to by Uson, as well as an agreement to be personally responsible for the performance of BET's obligations, no reciprocal obligations on the part of BNL to Uson were created by which Uson would be considered a party. Additionally, by intervening into the Agreement, Uson did not become a party to it or thereby acquire any personal benefits or rights against BNL. Uson's intervention into the Agreement was made solely to provide security to BNL for the performance of BET's obligations thereunder. *See* La. C.C. art. 1913. Uson was solely a guarantor or surety of BET's obligations. *See* La. C.C. art. 3035.[48]

The Court held that because Uson was not a party to the agreement, he had no right of action.

---

[47] *Brednich v. Bourbon Nite-Life, LLC*, 2012-1209 (La.App. 4 Cir. 12/19/12); 108 So.3d 235, *writ denied* 2013-0168 (La. 3/1/13); 108 So.3d 1182.

[48] *Id.* at 239 (footnote omitted).

In *Sullivan v. Harris Mortgage, Corp.*,[49] Three M-C, Inc. ("3M-C") entered into a
construction loan with ATICO Mortgage Investors ("ATICO") as primary lender and Harris
Mortgage Corp. ("Harris") as a secondary lender.  Frank Sullivan ("Sullivan'), a contractor, entered
into a contract with 3M-C to build Astroland Subdivision.  Attached to the contract was a statement
signed by Sullivan setting the disbursement schedule.  ATICO also signed the statement.  The
disbursing agent was Dutel Title Agency ("Dutel").

When 3M-C failed to make the payments owed to Sullivan, he sued ATICO, Harris, 3M-C,
and Dutel.  3M-C filed for bankruptcy relief.

Sullivan alleged that ATICO, Harris, and Dutel induced him to enter the contract with 3M-C
and were liable as primary obligors.  The Court held that ATICO, Harris, and Dutel were not liable:

> Taken as a whole, we are convinced that this addendum to the contract did nothing
> more than assure the contractor that a loan had been approved and money would be
> disbursed.  To find the defendants to be primary obligors, there must be more
> definitive language used.[50]

Finally, there is the case of *S. & R. Gas Company, Inc. v. Stephens*,[51] whose facts are closer
to the situation presented.  In *Stephens*, Frank Roberson ("Roberson") and Albert Stephens
("Albert") were  50% owners of three companies: S. & R. Gas Company, Inc. ("S & R"), Campti
Butane, Inc. ("Campti"), and S. & R. Tank Line, Inc. ("Tank").  S & R and Campti were in the
business of selling liquefied petroleum gas.  Roberson and Stephens reached a point in their

---

[49] *Sullivan v. Harris Mortgage Corp.*, 343 So.2d 236 (La.App. 1 Cir. 1977).

[50] *Id.* at 239.  La. C.C. Art. 1796 provides:

Solidarity of obligation shall not be presumed.  A solidary obligation arises from
a clear expression of the parties' intent or from the law.

[51] *S. & R. Gas Company, Inc. v. Stephens*, 90 So.2d 487 (La. App. 2 Cir.  1956), *rev'd on
other grounds*, 99 So.2d 5 (La. 1958).

relationship where joint ownership of the businesses was untenable.  In November 1954, Roberson sold his stock in the three corporations to Albert by written agreement.   As Albert had given his son, John Stephens ("John"), 200 shares of stock, John signed the sale agreement in addition to Roberson and Albert.  The Agreement provided:

> And, now, appeared John S. Stephens for the express purpose of declaring that, for an adequate consideration, he assigned and delivered the heretofore described stock certificates, listed in his name, to his father, A. L. Stephens for transfer to F. J. Roberson under the terms of this agreement.[52]

On December 1, 1954, Albert reacquired John's stock and transferred all his holdings to Stephens.

The sale agreement included a non-competition clause and Albert publicly claimed that he would seek revenge against Roberson for his perceived financial loss.  Following the sale, Albert and John consulted an attorney regarding whether John was bound by the non-competition clause.  Following the meeting, Albert and John met with J. B. Beird Co. to discuss the price of storage equipment for liquefied petroleum gas and John ordered the equipment.   John used the money obtained from the sale of his S&R shares to fund the purchase.

Shortly thereafter, John began selling liquefied petroleum gas through a new corporation, Eagle Gas Co. ("Eagle").  However, Albert participated in Eagle's operations.  Roberson sued both Albert and John alleging breach of contract.

The Court held that Albert's and John's actions were so closely related that John was the alter ego of Albert.  As a result, in forming Eagle, both violated the non-competition clause:

> [I]n the instant case, it is utterly impossible to draw a clearly defined line of demarcation between the actions of these two parties in their father and son relationship and their actions as two closely identified individuals engaged in the

---

[52]  90 So.2d at 491.

confection of a plan which violated the explicit terms of a contract obligation assumed by one.[53]

The Court held that John was liable *in solido* with Albert pursuant to La. C.C. Art. 2324. The Court

enjoined Albert and John from selling liquefied petroleum gas as Eagle or individually.[54]  However,

the Court noted that John was not liable to Roberson under the agreement.

> We do not think the appearance of John Stephens and his execution of the contract of November 12, 1954, would have served to bind him under the terms of the restrictive covenant which was enforced against his father if John Stephens had thereafter acted purely and simply on his own and in a capacity that was completely distinct, separate and apart from any association with his father.[55]

The *Stephens* decision is instructive to the analysis of this case.  Although a signatory to the

Purchase Agreement, Willow Bend is not a party to it and has no rights or obligations under it save

those arising from its pledge to maintain ownership of the Property until the purchase of the

membership interest was completed.  Like the *Stephens* case, Willow Bend did not, through its

intervention, obligate itself to any additional obligations, representations, or warranties incurred by

Lee, HLRC, or River Parishes.[56]

---

[53] *Id.* at 497.

[54] On writ of certiorari to the Louisiana Supreme Court, John alleged that he sold Eagle and its assets to a corporation in which he and Albert had no affiliation.  As a result, the Court ordered the case dismissed as moot. *S. & R. Gas Company, Inc. v. Stephens*, 99 So.2d 5 (La. 1958).

[55] 90 So.2d at 497.

[56]  The Bankruptcy Estate of Willow Bend has at all times acted independently and distinctly from Lee and HRLC, and its appearance in the Purchase Agreement cannot be charged as the act of an alter ego.

River Parishes has failed to provide any legal support for the proposition that as an intervenor, Willow Bend has any duty to the parties other than one arising from the strict subject of the intervention.  Since River Parishes bears the burden on the point,  the Court concludes that Willow Bend has no responsibility for the actions of Lee or HRLC and had no duty to River Parishes under the Purchase Agreement for the representations and warranties made by Lee or HRLC.  Thus, Willow Bend did not act wrongfully.

### 3. The Purchase Agreement Provided No Anticipated Benefit for the Willow Bend Estate

In order for River Parishes to successfully claim an administrative expense, it must show that the execution of the Purchase Agreement or contemplated sale stood to benefit the bankruptcy estate and was made in the ordinary course of Willow Bend's business.  River Parishes has failed to articulate any benefit received or anticipated in favor of the Willow Bend estate under the Purchase Agreement.

Unlike the *Reading* case, the Purchase Agreement does not on its face provide any opportunity for Willow Bend to benefit from the sale.  Willow Bend received no consideration under the Purchase Agreement, nor did it have any expectation of benefit on completion of the sale.  The Purchase Agreement did not improve Willow Bend's financial status or provide the chance of payment to existing creditors.  The Sellers (HRLC and Lee) and the Buyer (River Parishes) were the only beneficiaries of the Purchase Agreement.   HRLC and Lee were to receive the entire purchase price, and River Parishes was to receive the membership interests.

The Purchase Agreement was not made in the ordinary course of Willow Bend's business. Courts employ the "horizontal" and "vertical dimension" test to determine what is in the ordinary course of a debtor's business:

> The horizontal dimension test focuses on whether other businesses in the same industry engage in the same type of transaction on a regular basis. The vertical dimension test focuses on the expectations of creditors of the estate. The transaction may be outside the ordinary course of business if a hypothetical creditor would perceive that the economic risk of the postpetition transaction varies from the prepetition risk of the transaction. Neither test is objective, and it is still necessary to look at the how the underlying transaction intersects with the current business of the enterprise.[57]

Willow Bend's business was selling clay, not membership interests. Under any test, the Purchase Agreement is not in the ordinary course of Willow Bend's business.

**B. Transactions with Insiders**

In addition, Willow Bend's appearance in the Purchase Agreement was not authorized by the Court. The operation of a debtor's business in Chapter 11 continues mostly unimpeded after a bankruptcy case is filed. The purpose of reorganization is to provide a respite from creditor claims while a debtor attempts to regain profitability. As a result, a debtor's normal operations carry on without need for specific court permission.[58]

---

[57] 3 COLLIER ON BANKRUPTCY ¶ 503.06[5][c] (Richard Levin & Henry J. Sommer eds., 16th ed.).

[58] This applies to ordinary operations but not to every act done in its business, *e.g.,* 1) the obtaining of credit; 2) the granting of security interests; and 3) payment of compensation to insiders or professionals is subject to court review and approval. *See* 11 U.S.C. §§ 327, 364, 502(b)(4), 503(c).

The opposite is true for conduct outside the ordinary course.  Actions by a debtor outside the ordinary course of its business must be authorized by the Court.[59]   This protects the estate from activities which pose unnecessary risk to its corpus.   Conduct which involves an insider is specifically circumspect because of an insider's influence and control over a debtor.[60]

Section 503(c)(3) provides that an administrative expense claim ***shall not be paid for***:

> [O]ther transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

"Section 503(c) was enacted to limit a debtor's ability to favor powerful insiders economically and at estate expense during a chapter 11 case."[61]   Section 503(c)(3) is most commonly cited when employee compensation packages are at issue.

> [Section 503(c)] applies to transfers made to or obligations incurred for the benefit of an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, unless the court makes certain specified findings.  In addition, it prohibits a severance payment to an insider of a debtor, unless it satisfies certain criteria.  Further, it prohibits the payment of other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.[62]

---

[59] 11 U.S.C. § 363. *See The Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.*), 780 F.2d 1223, 1226 (5th Cir. 1986).

[60] *See Fabricators, Inc. v. Technical Fabricators, Inc. (Matter of Fabricators, Inc.)*, 926 F.2d 1458, 1465 (5th Cir. 1991) ("A claim arising from the dealings between a debtor and an insider is to be rigorously scrutinized by the courts.").

[61] *In re Pilgrim's Pride Corp.*, 401 B.R. 229, 234 (Bankr.N.D.Tex. 2009) (citations omitted).

[62] HR Rep. 109-31(I), p. *84, 109th Cong., 1st Sess. 2005, 2005 WL 832198.

Courts should not rely on the business judgment of conflicted insiders and instead make their own determination as to whether the transfer or obligation is "justified."

> Given the obvious conflict of interest between a debtor's estate and insiders - who may themselves have been responsible in whole or part for devising and internally approving the proposed transaction - the argument underlying the application of the business judgment rule (that officers and directors will fulfill their fiduciary responsibilities) lacks its usual weight.[63]

The facts of the case at bar are the very types of action section 503(c)(3) was enacted to prevent. Willow Bend appears in the Purchase Agreement through its sole member, HRLC. Willow Bend was not a beneficiary of the Purchase Agreement and did not have unconflicted representation when signing the Purchase Agreement. Under these circumstances, any agreement entered into by Willow Bend postpetition, without court authority, outside the ordinary course of business, and for the sole benefit of its principal is voidable[64] and not entitled to administrative expense priority under section 503.

The Court finds that the Purchase Agreement was outside the ordinary course of business and not justified by the facts and circumstances of the case.

---

[63] *In re Pilgrim's Pride Corp.*, 401 B.R. at 237.

[64] Acts done in violation of the automatic stay are voidable. *Chapman v. Bituminous Ins. Co. (In re Coho Res., Inc.),* 345 F.3d 338, 344 (5th Cir. 2003); *Sikes v. Global Marine, Inc.*, 881 F.2d 176 (5th Cir. 1989).

**III.  Conclusion**

For the above reasons, the Court holds that River Parishes does not have an administrative expense claim.  A separate Judgment will be entered in accord with this Opinion.

New Orleans, Louisiana, May 24, 2019.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge